The Honorable Clay Aurand State Representative, 109th District State Capitol, Room 381-W Topeka, Kansas 66612
Dear Representative Aurand:
You inquire regarding the constitutionality of the State Scholarship Program[1] and the Kansas Comprehensive Grant Program[2] under Section 7 of the Kansas Bill of Rights and Article 6, Section 6(c) of the Kansas Constitution. Your concern focuses on whether the programs violate these constitutional provisions in light of former Attorney General Carla J. Stovall's opinion[3] regarding proposed school voucher programs.
Section 7 of the Kansas Bill of Rights (Religious Liberty Clause) provides, in part:
 "The right to worship God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend or support any form of worship. . . ."[4]
Article 6, Section 6(c) of the Kansas Constitution provides:
 "No religious sect . . . shall control any part of the public educational funds."
 I. The State Scholarship and Kansas Comprehensive Grant Programs
The State Scholarship Program and the Kansas Comprehensive Grant Program provide state scholarships and grants to financially and scholastically qualified students enrolled in either state or private post secondary institutions.[5] Private post secondary institutions may include sectarian or secular colleges and universities.[6] The distribution of scholarships and grants are made pursuant to vouchers approved by the Board of Regents which are issued as warrants to the eligible post secondary institution where the student is enrolled.[7]
The funds are immediately allocated to the student's account.[8]
Eligibility standards for post secondary educational institutions require that the institution be either: (1) a state educational institution or (2) a not-for-profit independent institution that (a) maintains an open enrollment policy[9] (i.e. a policy that allows enrollment for every student meeting academic requirements without regard to race, sex, religion, creed or national origin), (b) is accredited by the North Central Association of Colleges and Secondary Schools Accrediting Agency, and (c) has a main campus located in Kansas.[10]
In reviewing the constitutionality of these programs, we are mindful that these statutes are cloaked with the presumption of constitutionality and all doubts regarding their constitutionality must be resolved in their favor.[11] Therefore, unless these statutory schemes are contrary to the express or implied provisions of the Religious Liberty Clause or Article 6, Section 6(c) of the Kansas Constitution, we cannot conclude that they are invalid.[12]
 II. Prior Attorney General Opinions Addressing the Religious LibertyClause and Article 6, § 6(c) of the Kansas Constitution
Unfortunately, the four cases construing the Kansas Religious Liberty Clause and Article 6, Section 6(c) of the Kansas Constitution that were relied upon in prior Attorney General opinions addressing school voucher legislation[13] are not helpful because those cases do not address the propriety of providing public funds to qualified students who then use the funds to purchase educational services at either a public or a private sectarian college or university. We mention these opinions now only for the purpose of demonstrating their inadequacy in addressing the issue before us.
In Atchison, T. S.F.R. Co. v. City of Atchison,[14] a railroad company challenged the use of public funds to pay a subscription to two private sectarian colleges. Neither of the constitutional provisions at issue here were mentioned, the Court being more concerned that the funds were used to promote private, rather than public, interests.[15]
The issue in Billard v. Board of Education[16] was whether requiring public school students to repeat the Lord's Prayer and the Twenty-Third Psalm in class constituted "religious worship." Finding no intention on the part of the teacher to inculcate religious dogma, the Court concluded that the dissenting student was not being compelled to worship and, therefore, neither of the constitutional provisions at issue here were violated.
The other "compelled worship" case is State v. Evans,[17] where the Kansas Court of Appeals invalidated a condition of probation that required church attendance at a specific church because the requirement constituted religious coercion in violation of the Religious Liberty Clause prohibition on compelled worship. As the State is not requiring students to attend sectarian colleges and universities, neither Billard
nor Evans is applicable.
The last case that considers the two constitutional provisions at issue here is Wright v. School District No. 27 of Woodson County,[18] where a taxpayer brought an injunction action to prevent the school district from funneling public funds to a "dormitory and home of [a] priest and sisters of a Catholic church" who were apparently operating a school where the curriculum was allegedly "sectarian and parochial." Citing the Religious Liberty Clause and the provision prohibiting religious sects from controlling educational funds, the Court concluded that the facts alleged in the petition were sufficient to withstand a demurrer. As the issue was whether the petition stated a cause of action, this antiquated case has limited value in determining whether public funds can be awarded to a person who then chooses to use those funds to pay for an education at a private sectarian college or university.
III. The Origins of the Religious Liberty Clause and Article 6, §6(c) of the Kansas Constitution
In the absence of any relevant Kansas appellate court decisions that provide guidance interpreting the Religious Liberty Clause and Article 6, Section 6(c)[19] of the Kansas Constitution in this context, we look to the intent of the Framers in ascertaining their meaning.[20]
There was no debate or discussion during the 1859 Wyandotte Convention regarding either provision, but it appears that both were modeled after the Ohio Constitution.[21] The provision ensuring religious liberty, Section 7 of the Bill of Rights, was not novel as it had been adopted in similar forms in numerous state constitutions before and subsequent to its adoption in Kansas.[22]
These religious liberty clauses are rooted in Thomas Jefferson's Actfor Establishing Religious Freedom,[23] which provides, in part, that "no man shall be compelled to . . . support any religious worship, place, or ministry whatsover. . . ."[24] Despite the different wording in the First Amendment to the United States Constitution,[25]
Jefferson's Act has been recognized by the United States Supreme Court as the basis for the First Amendment because both "had the same objective and were intended to provide the same protection against government intrusion on religious liberty."[26]
As Jefferson's Act for Establishing Religious Freedom is the source for both the First Amendment and the numerous religious liberty provisions that appear in many state constitutions, including Kansas, it is instructive to consider the historical events that spawned Jefferson's treatise.
Prior to the American Revolution, Virginia, as well as several of the original colonies, had established state sponsored churches which all citizens were required to support regardless of individual religious belief or nonbelief.[27] Jefferson's Act, which would have abolished support for state sponsored churches, had been offered and rejected by the Virginia Assembly in 1779, but was resurrected in 1785 as a counter proposal to a proposed law that would have renewed a tax for the support of Christian "ministers or teachers of the gospel."[28] This tax had originally been enacted to support only Anglican ministers' salaries but, at the behest of angry Baptists and other Protestant sects, the Assembly proposed to extend the tax to support all "Christian" ministers.[29]
Both Jefferson and James Madison, who was the principal author of theFirst Amendment's Establishment and Free Exercise Clause, opposed the tax.[30] Successful in garnering opposition from non-Anglican denominations, the bill died in committee. Jefferson's Act, assuring both the free exercise of and the disestablishment of government supported churches, was enacted in its stead.[31]
Clearly, our state courts can interpret the Kansas Constitution in a more restrictive manner than the United States Supreme Court's interpretation of the First Amendment.[32] However, in light of the fact that the Religious Liberty Clause is patterned after Thomas Jefferson's Act, which is also the foundation for the First Amendment, it is possible that a Kansas appellate court would conclude that the reach of the Religious Liberty Clause is coextensive with the First Amendment. This conclusion would lead to the application of the United States Supreme Court's analysis in Lemon v. Kurtzman[33] and its progeny[34]
regarding government aid to students enrolled in sectarian schools.
While the Kansas appellate courts have not considered whether the Religious Liberty Clause is or is not more restrictive than the First
Amendment, the Kansas Supreme Court has opined that the First Amendment and the Religious Liberty Clause both embrace the same concepts: the prohibition of an established religion by the government and the guarantee of free exercise of religion by all.[35]
 IV. Post Secondary Grant/Scholarship Programs in Other Jurisdictions
Three jurisdictions have applied a First Amendment analysis when examining post secondary grant/scholarship programs under state constitutional provisions similar to Kansas' religious liberty clause, Section 7 of the Bill of Rights.[36]
In Americans United for Separation of Church and State Fund, Inc. v.State of Colorado,[37] the Colorado Supreme Court reviewed the Colorado Student Incentive Grant Program which, like Kansas, awarded grants to eligible students enrolled in either public or private post secondary institutions. The program expressly excluded institutions deemed "pervasively sectarian."[38] An institution was deemed not "pervasively sectarian" if the following factors existed: (1) no required attendance at religious services; (2) a strong commitment to the principles of academic freedom; (3) no required courses in religion or theology that tended to indoctrinate or proselytize; (4) membership on governing body not limited to persons of any particular religion; and (5) limited funding from sources advocating a particular religion.[39]
The Colorado Court scrutinized the program under both the First
Amendment and Article II, Section 4 of the Colorado Constitution, which states in part:
 "No person shall be required to attend or support any ministry or place of worship, religious sect or denomination against his consent. Nor shall any preference be given by law to any religious denomination or mode of worship."
Plaintiffs argued unsuccessfully that the program compelled Colorado taxpayers to support sectarian institutions in violation of both theFirst Amendment and the Colorado Constitution. While the Court noted that the state constitution was more specific than the Establishment Clause of the First Amendment, it construed the state constitution to "embody the same values of free exercise and governmental non-involvement secured by the religious clauses of the First Amendment."[40] The Court also construed the provision in light of the history of tax-supported churches in other states which was the mischief that the framers of Colorado's Constitution wanted to avoid.
The Court also reviewed a provision of the Colorado Constitution similar to Article 6, Section 6(c) of the Kansas Constitution that prohibited the use of public funds "to support . . . any school . . . controlled by any church or sectarian denomination." Interpreting the intent to forestall public support of institutions controlled by religious sects, the Court concluded that the statutory scheme passed muster because: (1) the aid was designed to assist the student, not the institution; (2) the financial aid was available only to students attending institutions of higher education where the risk of religious indoctrination was insubstantial; (3) the aid was available to students attending both public and private institutions thereby dispelling the notion that the aid was calculated to enhance the ideological ends of the sectarian institution; and (4) the statutory criteria required a strong commitment to academic freedom by an independent governing board with no sectarian bent in the curriculum tending to indoctrinate or proselytize.
Alabama Education Assn. v. James[41] examined a college tuition grant program similar to the Colorado and Kansas programs. After opining that the state constitutional proscription compelling attendance "at any place of worship"[42] was not more restrictive than the First Amendment, the Court utilized First Amendment case law to uphold the program. The Court also concluded that because the grants were for the benefit of the student rather than the post secondary institution, there was no violation of the state constitutional provision prohibiting the use of public funds "for the support of any sectarian or denominational school."[43]
In light of the fact that the Religious Liberty Clause is patterned on Article 1, Section 7 of the Ohio Constitution,[44] it is noteworthy that the Ohio Supreme Court deemed its religious liberty clause the "approximate equivalent" of the Establishment Clause of the First
Amendment in the context of a school voucher case.[45] By doing so, the Court adopted the elements of the three-part Lemon v. Kurtzman[46] test to uphold the program.
Turning to the constitutional provision prohibiting control of school funds by religious sects,[47] the Ohio Supreme Court opined that simply because a private school received an indirect benefit from a publically funded program did not mean that the school had "control" of state school funds.[48]
While we can only speculate whether the Kansas appellate courts would consider the Religious Liberty Clause coextensive with or, at least, not more restrictive than the First Amendment, it is our opinion that a Kansas Court would do so because the Religious Liberty Clause is modeled after Ohio's provision which has been determined to be equivalent to the Establishment Clause. Moreover, the Religious Liberty Clause emanates from Thomas Jefferson's Act for Establishing Religious Freedom which formed the basis for the First Amendment.
V. Prior Kansas Tuition Grant Program Upheld by Kansas FederalDistrict Court
In addition to the three jurisdictions previously mentioned that upheld similar post secondary grant programs under both First Amendment and state constitutional provisions, a Kansas federal district court, in 1974, upheld a tuition grant program[49] that was the predecessor to the current Kansas Comprehensive Grant Program.
In Americans United for Separation of Church and State v. Bubb,[50]
the United States District Court for the District of Kansas reviewed a tuition grant program that provided state grants to financially needy students enrolled at private post secondary educational institutions. Plaintiffs argued unsuccessfully that the program violated the First
Amendment on the grounds that the tuition grants subsidized and advanced the mission of the religious institutions that were affiliated with the institution. After reviewing the statutory scheme and the operations of the independent colleges in question, the Court, applying the three-pronged Lemon v. Kurtzman test, concluded that the statutes withstood scrutiny under the First Amendment but that the tuition grant program violated the First Amendment, as applied to certain institutions, where religion was "so pervasive that a substantial portion of [the institution's] functions [was] subsumed in the religious mission."[51]
This case is instructive because the grant program reviewed in Bubb is almost identical to the Kansas Comprehensive Grant Program and the State Scholarship Program. The tuition grant program reviewed in Bubb provided grants to certain financially qualified students enrolled in an "accredited independent institution." In order to qualify as an "accredited independent institution," the latter had to: (1) be operated independently and not controlled by a state agency; (2) maintain an open enrollment (i.e. a policy that allowed enrollment for every student meeting academic requirements without regard to race, sex, religion, creed or national origin); and (3) be accredited by the North Central Association of Colleges and Secondary Schools.
In Bubb, the program awarded grants by way of a voucher approved by the State Education Commission which, upon receipt by the Director of Accounts and Reports, issued a warrant in the name of the student to be delivered to the private institution in which the student was enrolled. Likewise, the distribution of funds for the Grant and Scholarship Programs are made pursuant to vouchers approved by the Board of Regents which are then issued as warrants to the eligible institution where the student is enrolled. The funds are then allocated to the account of the student.
Applying the analysis prescribed in Lemon v. Kurtzman,[52] the Court found the following factors to be determinative in upholding the facial constitutionality of the statute:
 1. The institutions were not instruments of the church for purposes of indoctrination or proselytizing.
 2. The academic curriculum was similar to state institutions of higher learning in that the curriculum was a program of general education that enabled the student to become acquainted with the major areas of knowledge.
 3. Religious affiliation was not required of faculty members. Faculty members were given absolute freedom in teaching their classes and were not subject to ecclesiastical direction.
 4. While religious courses were required as part of the humanities requirement, the student was free to select the course. The religion courses differed little from those courses offered at state institutions.
 5. All religion courses were taught from an academic approach that encouraged open investigation rather than dogmatic sectarian indoctrination.
 6. Academic policy was determined by the faculty and dean rather than a religious body.
7. Extracurricular religious activities were voluntary.
While it has been 30 years since the decision, we believe that the federal district court's First Amendment analysis is still sound. Further, we believe that a Kansas appellate court would apply a Lemon v.Kurtzman analysis under a Section 7 challenge as well and conclude that the State Scholarship Program and the Kansas Comprehensive Grant Program are facially constitutional under the Religious Liberty Clause.
VI. Article 6, § 6(c) of the Kansas Constitution
Insofar as Article 6, Section 6(c) is concerned, we note in addition to the cases already cited from other jurisdictions that have upheld tuition grant programs under similar state constitutional provisions,[53] the legislative history of the 1966 amendment to Article 6 indicates that Section 6 was not intended to "prohibit the appropriation of public funds to indirectly benefit private institutions:"[54]
"In connection with the drafting of federal aid to education bills in Congress, it was decided that the wording such as used in [Section 6] would not prevent the distribution of public funds for students in private schools. As long as the funds remain under public control they can be distributed to pupils attending private schools. Present constitutional interpretation is that neither the existing constitution nor the proposed amendment prohibits the distribution of public funds for the benefit of pupils in private parochial schools. Administration of tax revenues, distribution, control and receipt of funds must remain under public control. As long as these conditions are met, funds may be distributed for the purpose of benefitting pupils in the private schools. The child, rather than the private organization, thus isbenefitted. Therefore, there is nothing in the proposed language that would impede or obstruct the distribution of federal funds to private schools."[55]
While it is arguable that it was only federal moneys that were exempt from the constitutional proscription of control of educational funds by religious sects, the same rationale — that it is the student who "controls" the funds, not a "religious sect" — is equally applicable to the scholarships/grants at issue here. Therefore, it is our opinion that because the grant and scholarship funds are awarded to the student who selects the institution, there is no "control" by a "religious sect" and neither the State Scholarship Program or the Kansas Comprehensive Grant Program facially violate Article 6, Section 6(c) of the Kansas Constitution.
VII. The State Scholarship Program and the Kansas ComprehensiveGrant Program as Compared to School Voucher Programs
You inquire whether there are substantive differences between the State Scholarship and
Kansas Comprehensive Grant Programs and school voucher programs for elementary and secondary schools. In two cases that considered the college/university grant program,[56] both Courts, when applying the second prong of the Lemon v. Kurtzman analysis regarding whether the program's "principal or primary effect advances religion," noted that, unlike sectarian elementary schools, religious indoctrination is not a substantial purpose of sectarian colleges, and, therefore, there is less risk of religion intruding into the secular education function.[57]
Since the decision in these cases, the "primary effect" element of theLemon v. Kurtzman analysis has been refined in indirect aid cases to incorporate two factors: (1) whether the program administers aid in a neutral fashion, without differentiation based on the religious status of the beneficiaries or providers of service; and (2) whether the beneficiaries of indirect aid have a genuine choice among religious and nonreligious organizations when determining the organization to which they will direct aid. If the answer to either query is "no," the program violates the Establishment Clause.[58] In our opinion, the religious indoctrination distinction no longer appears to be a factor when considering a facial challenge under the Establishment Clause.[59]
 VIII. School Voucher Programs
As we have determined that both the State Scholarship and Kansas Comprehensive Grant programs, on their face, pass state constitutional scrutiny, you inquire whether it would be "feasible to formulate legislation that would implement a voucher program similar to the State Scholarship and Kansas Comprehensive Grant programs."
Because we do not have the benefit of reviewing proposed legislation, we speak only in general terms. However, we note that former Attorney General Carla J. Stovall found no First Amendment concerns in proposed school voucher legislation.[60] As indicated previously, we believe that a Kansas appellate court would apply a First Amendment analysis in interpreting the Religious Liberty Clause. As Ohio is the model for the Religious Liberty Clause, we examine the Ohio experience with school vouchers.
In Simmons-Harris v. Goff,[61] the Court considered Ohio's Pilot Project Scholarship Program, a school voucher program, that provided scholarships to financially eligible students residing within the Cleveland City School District. This case is important because the challenge was based not only on the First Amendment Establishment Clause but also on the provisions of Ohio's Constitution which are the models for the Kansas Religious Liberty Clause and Article 6, Section 6(c) of the Kansas Constitution.
Briefly, the program provided for scholarships to attend either a registered private school or a public school located in an adjacent school district. The scholarships to private schools took the form of a check payable to the student's parents which was required to be endorsed to the school.
Applying the rationale of Lemon v. Kurtzman and Agostini v. Felton,[62]
the Court, after determining that the program had a secular purpose, examined whether the program either advanced or inhibited religion. Using the criteria in Agostini, the Court concluded that the program did not result in governmental indoctrination because the only way that public funds reached sectarian schools was as a result of the choice of the student's parents. The second Agostini criteria [i.e. whether the program's recipients are defined by reference to religion] includes a requirement that a program not have "the effect of advancing religion by creating a financial incentive to undertake religious indoctrination." In the opinion of the Court, this requirement was violated because one of the statutory criteria for the admittance of students in private schools gave priority to students whose parents were affiliated with any organization that provided financial support to the school. While the Court held that this provision violated the Establishment Clause, the Court upheld the program after severing the offending provision from the remainder of the statutory scheme.
Although the school voucher program survived constitutional scrutiny under the federal and state Establishment Clause constitutional provisions, it failed on another state constitutional ground. Three years later, after attending to the constitutional infirmity, the United States Supreme Court approved the program.[63]
While there are at least two jurisdictions that have struck school voucher programs under state constitutional provisions similar to the Religious Liberty Clause and Article 6, Section 6(c) of the Kansas Constitution,[64]
we suggest that if the Legislature is interested in pursuing school vouchers that it look at the Ohio program that was recently blessed, in 2002, by the United States Supreme Court. As that program has survivedFirst Amendment scrutiny as well as scrutiny by the Ohio Supreme Court under state constitutional provisions similar to the Religious Liberty Clause and Article 6, Section 6 of the Kansas Constitution, it is worthy of consideration in crafting a Kansas school voucher program.
VIII. Summary
It is our opinion that Section 7 of the Kansas Bill of Rights which prohibits the compelled support of religious worship is not more restrictive than the First Amendment to the United States Constitution when analyzing government aid to students attending private sectarian schools and post secondary educational institutions. Therefore, when examining challenges under Section 7, the appropriate standard of review is Lemon v. Kurtzman, 403 U.S. 602 (1973), and its progeny. Applying this standard, the State Scholarship Program and the Kansas Comprehensive Grant Program do not, on their face, violate Section 7. Moreover, Article6, Section 6(c) of the Kansas Constitution, which prohibits control of educational funds by religious sects does not prohibit government aid to students attending sectarian schools and post secondary educational institutions where the aid is for the benefit of the student, not the sectarian institution. As the State Scholarship and Kansas Comprehensive Grant Programs award scholarships/grants to qualified students who use the funds to purchase educational services at either a public or private sectarian college or university, neither program facially violates Article 6, Section 6(c). To the extent that the conclusions in Attorney General Opinion No. 2000-32 differ, those conclusions are hereby withdrawn.
Sincerely,
 PHILL KLINE Attorney General
 Mary Feighny Assistant Attorney General
PK:JLM:MF:jm
[1] K.S.A. 72-6810 et seq.
[2] K.S.A. 74-32,120 et seq.
[3] Attorney General Opinion No. 2000-32.
[4] Emphasis added.
[5] K.S.A. 72-6811; 74-32,121.
[6] K.S.A. 72-6810(e); 74-32,120(f).
[7] K.S.A. 72-6813; 74-32,123.
[8] Id.
[9] K.S.A. 72-6810(f); 74-32,120(g).
[10] K.S.A. 72-6811(e); 74-32,120(f). The Scholarship Program also requires that the institution be eligible for participation in the federal guaranteed-loan program.
[11] In re Barton-Dobenin, 269 Kan. 851 (2000).
[12] Petition of Stephan, 251 Kan. 597 (1992).
[13] Attorney General Opinions No. 2000-32, 94-37, 92-55.
[14] 47 Kan. 712 (1892).
[15] See Loan Assn. v. Topeka, 20 Wall 655 (1874).
[16] 69 Kan. 53 (1904).
[17] 14 Kan. App. 2d 591 (1990).
[18] 151 Kan. 485 (1940).
[19] At the time of its drafting, the provision prohibiting control of educational funds by religious sects was Article 6, § 8: "No religious sect . . . shall ever control any part of the common school or university funds of the State." Section 8 became Section 6(c) in the 1966 recodification of the Constitution and the verbiage was only slightly changed. Attorney General Opinion No. 2000-32.
[20] Board of County Comm'r of Leavenworth County v. McGraw FertilizerService, 261 Kan. 901, opinion mod. on rehearing, 261 Kan. 1082 (1997).
[21] Kansas Constitutional Convention: A Reprint of the Proceedings andDebates of the Convention Which Framed the Constitution of Kansas atWyandotte in July, 1859; Appendix D, p. 676 (1920). Article 1, § 7 of the Ohio Constitution provides in part: "No person shall be compelled to attend . . . or support any place of worship, or maintain any form of worship, against his conscience. . . ." Article VI, § 2 provides in part: "[but] no religious . . . sect . . . shall ever have any exclusive right to, or control of, any part of the school funds of this state."
[22] Arkansas Const., Art. 2, § 24; Connecticut Const., Art. 7; Delaware Const., Art. 1, § 1; Indiana Const., Art. 1, § 4; Ky. Const., Bill of Rights, § 5; Mich. Const., Art. I, § 4; Minn. Const., Art. I, § 16; Mo. Const., Art. 1, § 6; Neb. Const., Art. 1, § 4; Ohio Const., Art. 1, § 7;Penn. Const., Art. 1, § 3; Rhode Island Const., Art. 1, § 3; South Dakota, Art. 6, § 3; Tenn. Const., Art. 1, § 3; Tx. Const., Art. 1, § 6; Vt. Const., Ch. 1, Art. 3; Va. Const., Art. 1, § 16; West Va. Const., Art. 3, § 15; Wis. Art. 1, § 18. Locke v. Davey, 540 U.S. ___ (2004).
[23] Jefferson's Act is more commonly referred to as the "Virginia Bill for Religious Liberty."
[24] Everson v. Bd. of Education of Ewing Tp., 330 U.S. 1, 67 S.Ct. 504,91 L.Ed. 711 (1947); Locke v. Davey, 540 U.S. ___ (2004). See Laycock, ASurvey of Religious Liberty in the United States, 47 Ohio State L.J., 409, 410 (1986).
[25] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ."
[26] Everson, 67 S.Ct. at 510.
[27] Everson, 67 S.Ct. at 508-09; Locke v. Davey, 540 U.S. ___ (2004).
[28] A Bill Establishing a Provision for Teachers of the ChristianReligion, reprinted in the Appendix of Everson v. Bd. of Education ofEwing Tp., 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). Everson
provides a detailed history of Jefferson's Virginia Bill for ReligiousLiberty. See also Locke v. Davey, 540 U.S. ___ (2004).
[29] Laycock, A Survey of Religious Liberty in the United States,
47 Ohio State L.J., 409, 410 (1986).
[30] See Madison's Memorial and Remonstrance, reprinted in Churchand State in American History (1965).
[31] Note 24.
[32] State v. Scott, 265 Kan. 1 (1998); Hogan v. State, 38 P.3d 746
(Kan. 2002).
[33] 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1973) (statute does not violate the Establishment Clause when: (1) it has a secular purpose; (2) its primary effect neither advances nor inhibits religion; and (3) it does not excessively entangle government with religion).
[34] Witters v. Washington Dept. of Serv. for the Blind, 474 U.S. 481,106 S.Ct. 748, 88 L.Ed.2d 846 (1986); Agostini v. Felton, 521 U.S. 203,117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); Zelman v. Simmons-Harris,536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002).
[35] State, ex rel. Pringle v. Heritage Baptist Temple, 236 Kan. 544,546 (1985).
[36] See Americans United v. Rogers, 538 S.W.2d 711 (Mo. en banc 1976) (college tuition grant program upheld under both the First Amendment and State constitutional provisions prohibiting compelled support of religious worship and use of public funds to support colleges controlled by religious sects).
[37] 658 P.2d 1072 (Co. 1982).
[38] Id. at 1075-76.
[39] It should be noted that the Kansas programs that are the subject of this opinion do not contain such limiting language, however, such language is likely unnecessary to meet challenges under the Kansas Constitution as the scholarship and grant programs only indirectly assist private institutions and are primarily designed to benefit the student recipient. More likely, the Court will apply the analysis articulated inAmericans United for Separation of Church and State v. Bubb,379 F. Supp. 872 (D. Kan. 1974).
[40] Id. at 1081-82.
[41] 373 So.2d 1076 (Ala.1979).
[42] Opinion of the Justices, 280 So.2d 547 (Ala. 1973).
[43] Note 41 at 1081.
[44] Article 1, § 7 provides, in part: "[n]o person shall be compelled to attend . . . or support any place of worship. . . ."
[45] Simmons-Harris v. Goff, 711 N.E.2d 203 (Ohio 1999).
[46] 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1973) (statute does not violate the Establishment Clause when: (1) it has a secular purpose; (2) its primary effect neither advances nor inhibits religion; and (3) it does not excessively entangle government with religion).
[47] Article VI, § 2 of the Ohio Constitution provides, in part: "no religious sect . . . shall ever . . . control . . . any part of the school funds of the state."
[48] Note 45 at 212-13.
[49] K.S.A. 72-6107 et seq. (repealed, L. 1998, Ch. 165, § 10).
[50] 379 F. Supp. 872 (D.Kan. 1974).
[51] Id. at 892.
[52] 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).
[53] Americans United for Separation of Church and State Fund, Inc. v.State of Colorado, 658 P.2d 1072 (Co. 1982); Americans United v. Rogers,538 S.W.2d 711 (Mo. en banc 1976); Alabama Education Assn. v. James,373 So.2d 1076 (Ala. 1979).
[54] The Education Amendment to the Kansas Constitution, Kansas Legislative Council, Publication No. 256, p. 36 (Dec. 1965).
[55] Id. at 37 (emphasis added).
[56] Americans United for Separation of Church and State v. Bubb,370 F. Supp. 872, 891 (D.Ks. 1974); Americans United for Separation ofChurch and State Fund, Inc. v. State of Colorado, 648 P.2d 1072, 1084
(Co. 1982).
[57] See Tilton v. Richardson, 403 U.S. 672, 685-86, 91 S.Ct. 2091,29 L.Ed.2d 790 (1971) ("There are generally significant differences between the religious aspects of church-related institutions of higher learning and parochial elementary and secondary schools. The affirmative if not dominant policy of the instruction in pre-college church schools is to 'assure future adherents to a particular faith by having control of their total education at an early age.' (Citation omitted.) There is substance to the contention that college students are less impressionable and less susceptible to religious indoctrination").
[58] Agostini v. Felton, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391
(1997); Zelman v. Simmons-Harris, 536 U.S. 639, 122 S.Ct. 2460,153 L.Ed.2d 604(2002) (O'CONNOR, J., concurring in judgment).
[59] Zelman at 536 U.S. 652 ("[where] a government aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause").
[60] Attorney General Opinion No. 2000-32. See 2000 H.B. 2504, 2462; 2000 S.B. 295.
[61] 711 N.E.2d 203 (Ohio 1999).
[62] 521 U.S. 203, 117 S.Ct. 1997, 128 L.Ed.2d 391 (1997).
[63] Zelman v. Simmons-Harris, 536 U.S. 639,122 S.Ct. 2460,153 L.Ed.2d 604 (2002).
[64] Chittenden Town School District v. Dept. of Education, 738 A.2d 539
(Vt. 1999) (school tuition reimbursement program violated state constitution's prohibition that "no person . . . can be compelled to . . . support any place of worship . . . contrary to the dictates of conscience." In reviewing the history of the provision, the Vermont Supreme Court concluded that religious worship includes religious education and, therefore, without appropriate restrictions, public funds could not be used to pay tuition for a Catholic school that required: (1) instruction in theology designed to indoctrinate students; (2) mandatory attendance at religious services; and (3) faculty to adhere to Catholic doctrine in their teaching); Holmes v. Bush, 2002 WL 1809079 (Fl. Cir. Ct. 2002) (school voucher program offends state constitution which provides that "[n]o revenue of the state . . . shall ever be taken from the public treasury directly or indirectly in aid of any . . . sectarian institution." Court finds no constitutional merit in the fact that the vouchers are payable to the parents who then choose where to enroll their student).